**THOMPSON COBURN LLP**
**LUKAS SOSNICKI (SBN 295895)**
**lsosnicki@thompsoncoburn.com**
**JOSEPH SCOTT (SBN 330423)**
**jscott@thompsoncoburn.com**
**GREGORY G. BREZOVEC (SBN 340941)**
**gbrezovec@thompsoncoburn.com**
**10100 Santa Monica Blvd, Ste 500**
**Los Angeles, California 90067**
**Tel: (310) 282-2500 / Fax: (310) 282-2501**

Attorneys for Defendant
CHARTER COMMUNICATIONS, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER BARNETT, as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC., a Delaware corporation; and Does 1 through 20, inclusive,<br><br>Defendants. | Case No. 2:26-cv-01748-FMO (CTSx)<br><br>Assigned for all purposes to:<br>Hon. Fernando M. Olguin<br><br>**DEFENDANT CHARTER COMMUNICATIONS, INC.'S NOTICE OF MOTION AND RENEWED MOTION TO COMPEL ARBITRATION, STRIKE CLASS ALLEGATIONS, AND TO STAY, OR IN THE ALTERNATIVE, DISMISS PLAINTIFF'S CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[*Filed concurrently with Declaration of David Dean; Declaration of Lukas Sosnicki; [Proposed] Order*]<br><br>Date: December 3, 2026<br>Time: 10:00 a.m.<br>Courtroom: 6D |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE**, that on December 3, 2026, at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 6D, 6th Floor, of the above-entitled Court, located at 350 West 1st Street, Los Angeles, California 90012, the Honorable Fernando M. Olguin presiding, Defendant Charter Communications, Inc. ("Charter") will and hereby does respectfully move this Court to:

(1) compel individual arbitration of Plaintiff Christopher Barnett's ("Plaintiff") claims pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*;

(2) strike the Complaint's remaining class allegations pursuant to Federal Rules of Civil Procedure 12(f) and 23(d)(1)(D); and

(3) dismiss or stay this action.

This Motion is made following the conference of counsel pursuant to this Court's September 8, 2026 order (Dkt. 40) and L.R. 7-3, which began by Charter sending a letter detailing its position to Plaintiff's counsel on October 6, 2026, and continued through a videoconference between counsel on Wednesday, October 14, 2026. (Declaration of Lukas Sosnicki ¶¶ 1-3.)

This Motion will be based upon this Notice, the attached Memorandum of Points and Authorities, the Declaration of David Dean, the Declaration of Lukas Sosnicki, the Declaration of Chris Plumitallo (Dkt. 29-1), the arguments of counsel, and any other matter the Court may properly consider.

Dated: November 5, 2026 **THOMPSON COBURN LLP**

By: ______________________________

**LUKAS SOSNICKI**
**JOSEPH SCOTT**
**GREGORY G. BREZOVEC**
Attorneys for Defendant
CHARTER COMMUNICATIONS, INC.

# TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. BACKGROUND FACTS ........ 2

A. Plaintiff's Allegations and Charter's California Cost Recovery Charge. ........ 2

B. Charter's Residential Terms Include a Binding Arbitration Agreement. ........ 2

C. Plaintiff Agreed to the Residential Terms. ........ 4

III. THE COURT SHOULD ENFORCE THE ARBITRATION AGREEMENT ........ 5

A. The FAA Requires Enforcement of the Arbitration Agreement. ........ 6

B. The Parties Delegated Gateway Issues to the Arbitrator. ........ 7

C. The Court Need Not Consider Additional Gateway Issues, But, if It Does, This Dispute Falls Squarely Within the Scope of the Arbitration Agreement. ........ 10

i. The Arbitration Agreement Is a Valid Contract. ........ 10

a. Plaintiff Understood His Internet Services Were Governed by Terms and Conditions. ........ 11

b. Plaintiff Unambiguously Manifested His Assent to the Residential Terms in Multiple Ways. ........ 15

c. The Arbitration Agreement Is Supported by Consideration. ........ 16

ii. The Arbitration Agreement Covers Plaintiff's Claims. ........ 17

iii. Plaintiff's Anticipated *McGill* Argument Is Moot and Arbitrability of Claims Should Be Decided by the Arbitrator. ........ 18

IV. PLAINTIFF'S CLASS ALLEGATIONS SHOULD BE STRICKEN BASED ON HIS WAIVER OF CLASS CLAIMS ........ 21

V. THIS ACTION SHOULD BE DISMISSED OR AT LEAST STAYED ........ 22

VI. CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Mobility, LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 21

*B.D. v. Blizzard Entertainment, Inc.*,
76 Cal.App.5th 931 (Cal. Ct. App. 2022) .......... 10, 20

*Bayer v. Neiman Marcus Grp., Inc.*,
861 F.3d 853 (9th Cir. 2017) .......... 19

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 10, 13, 15

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .......... 7, 22

*Byrne v. Charter Commc'ns, Inc.*,
581 F. Supp. 3d 409 (D. Conn. 2022) .......... 16

*C.F. v. Capistrano Unified Sch. Dist.*,
647 F.Supp.2d 1187 (C.D. Cal. 2009) .......... 19

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) .......... 9, 20

*Cavanaugh v. Fanatics, LLC*,
738 F. Supp. 3d 1285 (E.D. Cal. 2024) .......... 12, 13, 14

*Chiron Corp. v. Ortho Diagnostics Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) .......... 10

*Circuit City Stores, Inc. v. Najd*,
294 F.3d 1104 (9th Cir. 2002) .......... 17

*Cova v. Charter Commc'ns, Inc.*,
No. 4:16-cv-469-RLW, 2017 WL 666097 (E.D. Mo. Feb. 17, 2017) .......... 16

*Crypto Asset Fund, LLC v. OPSkins Grp. Inc.*,
478 F. Supp. 3d 919 (C.D. Cal. 2020) .......... 10, 20

*Dean Witter Reynolds Inc. v. Byrd*,
470 U.S. 213 (1985) .......... 6

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002) .......... 6

*Engalla v. Permanente Med. Grp., Inc.*,
938 P.2d 903 (Cal. 1997) .......... 6

*Ewing v. Charter Communications Holding Co., Inc.*,
No. 3:17-cv-00222-BEN-WVG, 2017 WL 6049379 (S.D. Cal. Dec. 5, 2017) .......... 1

*Ferguson v. Corinthian Colls., Inc.*,
733 F.3d 928 (9th Cir. 2013) .......... 17

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
97 F.4th 1190 (9th Cir. 2024) .......... 10

*Garcia v. TriStruX LLC*,
No. 2:23-cv-08726-SVW-SSC, 2024 WL 4867234 (C.D. Cal. Sept. 18, 2024) .......... 7

*Garnett v. Topnotch Mgmt. LLC*,
No. 2:25-CV-00229-MCS-SSC, 2025 WL 1844208 (C.D. Cal. Apr. 3, 2025) .......... 7, 9

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .......... 15

*Hart v. Charter Communications, Inc.*,
No. SA CV 17-0556-DOC, 2017 WL 6942425 (C.D. Cal. Nov. 8, 2017), *aff'd,* 814 F. App'x 211 (9th Cir. 2020) .......... 1, 9, 15, 16

*Hartman v. Charter Communications, Inc.*,
No. 1:14-cv-00243-MR-DLH, 2015 WL 1756437 (W.D.N.C. Apr. 17, 2015) .......... 1

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 8

*Johnson v. Charter Commc'ns, Inc.*,
No. 21-CV-06135-HSG, 2022 WL 2673091 (N.D. Cal. June 2, 2022) .......... 9

*Lagatree v. Luce, Forward, Hamilton & Scripps*, 88 Cal. Rptr. 2d 664 (Cal. Ct. App. 1999) .......... 17

*Ligorria v. Loomis Armored US LLC*, No. CV 22-7116 PA, 2023 WL 3272397 (C.D. Cal. Feb. 28, 2023) .......... 22

*Mahram v. The Kroger Co.*, 324 Cal. Rptr. 3d 575 (Cal. Ct. App. 2024) .......... 10

*Marselian v. Wells Fargo & Co.*, 514 F.Supp.3d 1166 (N.D. Cal. 2021) .......... 20

*McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017) .......... *passim*

*McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036-JD, 2018 WL 1913832 (N.D. Cal. Jan. 24, 2018) .......... 17

*Melili v. Charter Commc'ns Operating, LLC*, No. 2:23-CV-00282-SPG-JPR, 2023 WL 12173445 (C.D. Cal. May 30, 2023) .......... 9, 21

*Mendieta v. L.P.*, No. 2:23-CV-2512-JLS-PVC, 2023 WL 6786844 (C.D. Cal. Sept. 19, 2023) .......... 9

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) .......... 6

*Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011) .......... 8

*Moran v. Charter Commc'ns, Inc.*, No. SACV2000303JVSJDEX, 2020 WL 5833640 (C.D. Cal. June 11, 2020) .......... 16

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) .......... 6

*New Castle Cnty. v. U.S. Fire Ins. Co.*, 728 F. Supp. 318 (D. Del. 1989) .......... 7

*Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505 (9th Cir. 2023) .......... 12

*Oracle Am., Inc. v. Myriad Group A.G.*,
724 F.3d 1069 (9th Cir. 2013) .......... 8

*Ortiz v. Univ. Credit Union*,
No. 25-2207, 2025 WL 3765497 (9th Cir. Dec. 30, 2025) .......... 14

*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) .......... 14, 15

*Patrowicz v. Transamerica HomeFirst, Inc.*,
359 F. Supp. 2d 140 (D. Conn. 2005) .......... 7

*Ramirez v. Elec. Arts Inc.*,
No. 20-cv-05672 BLF, 2021 WL 843184 (N.D. Cal. Mar. 5, 2021) .......... 20

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) .......... 7, 8

*Ruiz v. Sysco Food Servs.*,
18 Cal. Rptr. 3d 700 (Cal. Ct. App. 2004) .......... 17

*Sapan v. Directv, LLC*,
No. 822CV01600FWSJDE, 2023 WL 5505914 (C.D. Cal. June 9, 2023) .......... 17, 18

*Shivkov v. Artex Risk Sols., Inc.*,
974 F.3d 1051 (9th Cir. 2020) .......... 8

*United States v. Costanzo*,
956 F.3d 1088 (9th Cir. 2020) .......... 7

*United States v. Furrow*,
125 F. Supp. 2d 1178 (C.D. Cal. 2000) .......... 7

*Wilson v. Wells Fargo & Co.*,
No. 20-cv-2307-DMS-WVG, 2021 WL 1853587 (S.D. Cal. May 10, 2021) .......... 20

*Zaimi v. Neiman Marcus Grp., LLC*,
No. 2:22-CV-02972 AB (SKX), 2022 WL 19569536 (C.D. Cal. Aug. 31, 2022) .......... 8

**Statutes**

9 U.S.C. § 2 .......... 6

9 U.S.C. § 3 .......... 22

Cal. Civ. Code § 1605 .......... 17

Cal. Civ. Code § 1614 .......... 17

Federal Arbitration Act ("FAA") .......... 1, 3, 6, 7

Sherman Act .......... 12

TOA Output Location>

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Christopher Barnett ("Plaintiff") cannot represent the putative class proposed by the Complaint, and cannot pursue his claims in this venue, because he is bound by an arbitration agreement that requires Plaintiff to arbitrate his claims against Defendant Charter Communications, Inc. ("Charter") on an individual basis. By filing in this Court, Plaintiff breached that agreement.

The applicable mutual arbitration agreement ("Arbitration Agreement") is contained in Charter's "Spectrum Residential General Terms and Conditions of Service" ("Residential Terms"). This Court and others have enforced Charter's arbitration agreements in other matters, and the Court should do so here. *See, e.g.*, *Hart v. Charter Communications, Inc.*, No. SA CV 17-0556-DOC (RAOx), 2017 WL 6942425 (C.D. Cal. Nov. 8, 2017) (compelling arbitration of two named plaintiffs who were Charter internet subscribers bound by the Residential Services Agreement in a putative class action alleging Charter did not provide internet connections that were as fast as advertised); *Ewing v. Charter Communications Holding Co., Inc.*, No. 3:17-cv-00222-BEN-WVG, 2017 WL 6049379 (S.D. Cal. Dec. 5, 2017) (compelling arbitration of a Charter subscriber who failed to opt out of the applicable arbitration provision according to the terms of plaintiff's agreement with Charter); *Hartman v. Charter Communications, Inc.*, No. 1:14-cv-00243-MR-DLH, 2015 WL 1756437, at *3 (W.D.N.C. Apr. 17, 2015) (holding that a nearly identical arbitration provision "is enforceable by this Court" pursuant to the Federal Arbitration Act ("FAA")).

Moreover, the Arbitration Agreement is governed by the FAA and contains a delegation clause that vests the arbitrator with exclusive authority to decide gateway arbitrability issues. Thus, the application of the Arbitration Agreement to Plaintiff's claims is an issue for an American Arbitration Association ("AAA") arbitrator to decide in the first instance. That includes Plaintiff's anticipated *McGill* argument, which is also moot because Charter permanently discontinued the challenged

California Cost Recovery Charge in June 2026.

Finally, the Court should enforce Plaintiff's clear and explicit waiver of class claims by striking his class allegations. Plaintiff's claims should further be dismissed, or at least stayed, pending individual arbitration of his claims.

## II. BACKGROUND FACTS

### A. Plaintiff's Allegations and Charter's California Cost Recovery Charge.

Charter provides internet services to customers throughout the country under the brand name "Spectrum." (Compl. (Dkt. 1) ¶ 2.) Charter bills its customers monthly for these services. (Compl. ¶¶ 23-24.) Plaintiff alleges he "signed up for Spectrum's internet service via Spectrum's website located at https://www.spectrum.com." (Compl. ¶ 3.) He alleges that the putative class is composed of "consumers who were charged unlawful junk fees by Spectrum," specifically "Spectrum's additional $1.25 per month 'California Cost Recovery Charge.'" (Compl. ¶¶ 5, 26.)

Plaintiff challenges Charter's presentation of the California Cost Recovery Charge as an alleged "hidden" and "deceptive" fee. (*See, e.g.*, Compl. ¶¶ 63, 69.) The California Cost Recovery Charge was neither. It was repeatedly disclosed, including on Charter's website before and after Charter determined that a consumer is located in California, at the time a California customer contracted for Charter's internet services, and then in every monthly billing statement provided thereafter. (Declaration of David Dean ("Dean Decl.") ¶ 15, Exh. D; Compl. ¶ 26.)

### B. Charter's Residential Terms Include a Binding Arbitration Agreement.

Charter's relationship with its residential internet subscribers is governed by the Residential Terms. Charter provides its subscribers regular notice of these Residential Terms. When subscribers sign up for Charter services, as Plaintiff alleges he did on July 31, 2025, a copy of the Residential Terms is made available to them. (Compl. ¶ 8; Dean Decl. ¶¶ 6, 13, Exhs. A, B.) After they sign up, Charter also

provides subscribers with monthly billing statements that plainly reference the Residential Terms that govern the relationship. (Dean Decl. ¶¶ 15-16, Exh. D, January 21, 2026 Billing Statement, p. 3.) The Residential Terms also remain available on Charter's website at all times. (*Id.* ¶ 8, Exh. A.)

The first page of the Residential Terms Plaintiff accepted prominently notes that the agreement contains: "**A BINDING ARBITRATION PROVISION, WHICH INCLUDES A WAIVER OF YOUR RIGHT TO BRING CLAIMS AS CLASS ACTIONS** . . ." (*Id.* ¶ 14, Exh. C, p. 1 (emphasis in original).)

Section 30 of the Residential Terms contains the Arbitration Agreement itself, wherein Charter instructs all subscribers to "PLEASE READ [THIS SECTION] CAREFULLY TO ENSURE THAT SUBSCRIBER UNDERSTANDS EACH PROVISION." (*Id.* § 30.) The Arbitration Agreement states that "Spectrum and Subscriber agree to arbitrate disputes and claims arising out of or relating to these Terms of Service, the Services, the Equipment, or marketing of the Services Subscriber has received from Spectrum." (*Id.*; *see* p. 1 of Exh. C, defining "Services" as "all residential services provided by Spectrum".)

The Arbitration Agreement specifies that proceedings "shall be governed by the Consumer Arbitration Rules . . . of the American Arbitration Association ('AAA')" and grants the arbitrator authority to award damages or "injunctive relief only in favor of the party seeking relief, only to the extent sought, and only to the extent necessary to provide the specific relief warranted by such individual's claim." (*Id.*) In addition, the Arbitration Agreement identifies the FAA as the governing law, includes a mutual waiver of the right to participate in class actions, and delegates all arbitrability issues to the arbitrator. (*Id.*) In relevant part, it states as follows:

- <u>The FAA applies:</u> "THESE TERMS OF SERVICE MEMORIALIZE A TRANSACTION IN INTERSTATE COMMERCE. THE [FAA] GOVERNS THE INTERPRETATION AND ENFORCEMENT OF THESE ARBITRATION PROVISIONS." (*Id.*)

- Class claims are prohibited: "SUBSCRIBER AND SPECTRUM AGREE THAT CLAIMS MAY ONLY BE BROUGHT IN A PARTY'S INDIVIDUAL CAPACITY AND NOT ON BEHALF OF, OR AS PART OF, A CLASS ACTION OR REPRESENTATIVE PROCEEDING." (*Id.*)
- Arbitrability issues are delegated to the arbitrator: "[t]he arbitrator shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, scope, or enforceability of these arbitration provisions and these Terms of Service." (*Id.*)

**C. Plaintiff Agreed to the Residential Terms.**

Plaintiff cannot dispute that he accepted the Residential Terms. The Residential Terms provide that subscribers can accept the terms through several methods, such as by orally or electronically informing Charter of acceptance (through electronic signatures or a phone call). Alternatively, subscribers can agree to the Residential Terms by activating, using, or paying for Charter services, equipment, or devices. (Dean Decl. ¶ 14, Exh. C, Residential Terms § 1.a.)

Plaintiff is a Charter subscriber who accepted the Residential Terms through multiple methods on numerous occasions. (Compl. ¶¶ 26, 42 (alleging that the putative class is "all persons who, while in the state of California and within the applicable statute of limitations, purchased internet services from Spectrum and were charged any fees (excluding mandatory taxes) that were not included in the advertised price[.]").)

First, Plaintiff accepted the Residential Terms by "click through" agreement when he "signed up for Spectrum via its website located at https://www.spectrum.com." (Compl. ¶ 8; Dean Decl. ¶ 13.) When Plaintiff placed his order for Charter internet services on July 31, 2025, he checked a box unambiguously affirming his assent to Charter's terms of service, including the Residential Terms of Service. (Dean Decl. ¶ 13.) Charter presented that box immediately above a bolded, bright blue hyperlink to the Residential Terms. (*Id.* ¶ 13,

Exh. B.) An exemplar of the checkout page Plaintiff encountered, and presenting the Residential Terms, is below:




(*Id.*)

Every monthly billing statement that Plaintiff thereafter received provided him with further explicit notice of the Residential Terms. For example, Plaintiff's January 2026 billing statement includes the following notification regarding the Residential Terms: "**Terms & Conditions** – Spectrum's detailed standard terms and conditions for service are located at spectrum.com/policies." (Dean Decl. ¶ 15, Exh. D.)

Plaintiff's billing statement reflects that he paid for Charter services for the billing period January to February 2026. (Dean Decl. ¶ 15, Exh. D; *see also id.* ¶ 14, Exh. C, Residential Terms § 1.a (listing paying for Charter services as a form of acceptance).) In addition, Plaintiff's billing statement confirms that he has Charter equipment. (*Id.* ¶ 15, Exh. D, p. 1; *see also* ¶ 14, Exh. C, Residential Terms § 1.a (listing "activating a Service, Equipment or Device" or "use of . . . the Service, Equipment or Device" as a form of acceptance).)

## III. <u>THE COURT SHOULD ENFORCE THE ARBITRATION AGREEMENT</u>

The Court should enforce the Arbitration Agreement because Plaintiff's claims are subject to the Arbitration Agreement, a broad and valid individual arbitration

agreement that this and other federal courts have repeatedly upheld. Moreover, the parties delegated all questions of arbitrability to the arbitrator.

### A. The FAA Requires Enforcement of the Arbitration Agreement.

Congress enacted the FAA in 1925 "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). The FAA embodies "a liberal federal policy favoring arbitration agreements." *Id.* (internal quotation marks omitted). The United States Supreme Court has recognized an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). To this end, "[q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration" and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *accord Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 915 (Cal. 1997) ("California law incorporates many of the basic policy objectives contained in the [FAA], including a presumption in favor of arbitrability.").

The FAA applies to any arbitration agreement that satisfies two basic conditions: (1) it is in writing and (2) it is in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. When these requirements are present, there is "no place for the exercise of discretion by a district court, but instead [the FAA] mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

The Arbitration Agreement in the Residential Terms satisfies both criteria. It is written and publicly available on Charter's website. (Dean Decl. ¶ 8, Exh. A.) And it expressly confirms that Plaintiff's receipt of Charter's services involves

"INTERSTATE COMMERCE" and that the FAA "GOVERNS INTERPRETATION AND ENFORCEMENT OF THESE ARBITRATION PROVISIONS." (*Id.* § 25; ¶ 14, Exh. C, § 30.) Courts have recognized that the provision of television, telephone, and internet services is "intimately related to interstate commerce." *United States v. Costanzo*, 956 F.3d 1088, 1092 (9th Cir. 2020); *Garcia v. TriStruX LLC*, No. 2:23-cv-08726-SVW-SSC, 2024 WL 4867234, at *4–5 (C.D. Cal. Sept. 18, 2024) (holding that "a national telecommunications business clearly involved interstate commerce" (cleaned up)); *United States v. Furrow*, 125 F. Supp. 2d 1178, 1181 n.5 (C.D. Cal. 2000) (citing *Gibbs v. Babbitt*, 214 F.3d 483, 490–91 (4th Cir. 2000)) (explaining that channels of interstate commerce include television broadcast frequencies).

This is especially true here because the parties are citizens of different states. (*See* Compl. ¶¶ 7, 10 (alleging Plaintiff is a California resident and Charter is a Delaware corporation headquartered in Connecticut); *cf. Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 157 (D. Conn. 2005) ("Since the Loan Agreement is between a California and a Connecticut citizen and it involves interstate commerce, the [FAA] governs the present dispute."); *New Castle Cnty. v. U.S. Fire Ins. Co.*, 728 F. Supp. 318, 320 (D. Del. 1989) (finding the FAA governed a dispute between citizens of different states).

The FAA and its presumption in favor of arbitration apply to the Complaint.

**B. <u>The Parties Delegated Gateway Issues to the Arbitrator.</u>**

District courts may consider "two 'gateway' issues" when faced with a motion to compel arbitration: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). "But even these gateway issues can be submitted to an arbitrator where there is clear and unmistakable evidence that the parties intended that result." *Garnett v. Topnotch Mgmt. LLC*, No. 2:25-CV-00229-MCS-SSC, 2025 WL 1844208, at *2 (C.D. Cal. Apr. 3, 2025); *see also Rent-A-Ctr., W., Inc. v. Jackson*,

561 U.S. 63, 68–69 (2010) (noting "[p]arties can agree to arbitrate [these] 'gateway' questions of 'arbitrability'").

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 71 (2019). In other words, courts "**must** treat [the Arbitration Agreement] as valid under § 2 [of the FAA], and **must enforce it** under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *Rent-A-Ctr., W.*, 561 U.S. at 72 (emphasis added).

The Arbitration Agreement vests the arbitrator with "the exclusive authority to resolve any dispute relating to the interpretation, applicability, scope, or enforceability of the[] arbitration provisions." (Dean Decl. ¶ 14, Exh. C, § 30.) The Ninth Circuit has held that similar language demonstrates that the parties had "clear and unmistakable" intent to delegate arbitrability issues to the arbitrator. *See, e.g.*, *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (holding arbitration clause providing "the validity or application of any of the [arbitration clause] . . . shall be resolved exclusively by binding arbitration" was proof the parties "clearly and unmistakably agreed to arbitrate the question of arbitrability").

The Arbitration Agreement specifies that any "arbitration **shall be governed by the Consumer Arbitration Rules** (collectively, 'AAA Rules') of the American Arbitration Association ('AAA')[.]" (Dean Decl. ¶ 14, Exh. C, § 30) (emphasis added). The Ninth Circuit and this Court have repeatedly held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."[1] *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1068 (9th Cir. 2020); *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074

[1] The Central District has repeatedly upheld this rule regardless of any sophistication disparity between the parties. *See, e.g.*, *Zaimi v. Neiman Marcus Grp., LLC*, No. 2:22-CV-02972 AB (SKX), 2022 WL 19569536, at *4 (C.D. Cal. Aug. 31, 2022) (collecting cases).

(9th Cir. 2013) (noting "[v]irtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" and collecting authority); *Garnett*, 2025 WL 1844208, at *2 ("This Court consistently has held that incorporation of AAA rules into an arbitration agreement constitutes clear and unmistakable evidence of intent to delegate threshold questions of arbitrability to an arbitrator, regardless of the sophistication of the parties.").

In light of the Arbitration Agreement's clear delegation clause and explicit incorporation of the AAA consumer rules, this Court has repeatedly confirmed that Charter's Residential Terms contain "clear and unmistakable evidence of an agreement to arbitrate arbitrability." *See, e.g.*, *Hart*, 2017 WL 6942425, at *7 (holding parties "bound by their explicit agreement to refer questions of 'whether arbitration is appropriate' to an arbitrator"), *aff'd*, 814 F. App'x 211 (9th Cir. 2020).[2] This overwhelming, instructive authority demonstrates that Plaintiff and Charter delegated arbitrability issues to the arbitrator.

The parties' agreement to delegate gateway issues means that any challenges regarding scope of the arbitration agreement must be decided by the arbitrator—not the Court. *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) ("[I]f the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance."). The same is true for

[2] *See also Mendieta v. L.P.*, No. 2:23-CV-2512-JLS-PVC, 2023 WL 6786844, at *3 (C.D. Cal. Sept. 19, 2023) (holding the Residential Terms "clearly delegates questions of arbitrability to the arbitrator"); *Melili v. Charter Commc'ns Operating, LLC*, No. 2:23-CV-00282-SPG-JPR, 2023 WL 12173445, at *8 (C.D. Cal. May 30, 2023) ("The Court also finds that [Charter's] arbitration agreement, delegation clause, and class waiver are conspicuous and enforceable"); *Johnson v. Charter Commc'ns, Inc.*, No. 21-CV-06135-HSG, 2022 WL 2673091, at *3 (N.D. Cal. June 2, 2022) ("[T]he Court concludes that the [Residential Terms] 'clearly and unmistakably' delegates the question of arbitrability to the arbitrator.").

any challenges relating to unconscionability or issues of public policy. *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1199 (9th Cir. 2024) ("Such arbitrable threshold issues may include 'whether the [arbitration] [a]greement is unconscionable.'" (quoting *Rent-A-Ctr., W.*, 561 U.S. at 68); *Crypto Asset Fund, LLC v. OPSkins Grp. Inc.*, 478 F. Supp. 3d 919, 929 (C.D. Cal. 2020) (upholding a delegation clause despite argument "the arbitration agreement wa[s] unenforceable on grounds of fraud, unconscionability, and public policy"); *B.D. v. Blizzard Entertainment, Inc.*, 76 Cal.App.5th 931, 959 (Cal. Ct. App. 2022) ("[C]ourts routinely hold that the resolution of a *McGill* rule challenge is a gateway issue subject to delegation under a clause like the one here.").

**C. <u>The Court Need Not Consider Additional Gateway Issues, But, if It Does, This Dispute Falls Squarely Within the Scope of the Arbitration Agreement.</u>**

Even if the Court inquires beyond the delegation clause (it should not), the Court should send Plaintiff's claims to AAA arbitration.

The court's "role under the [FAA] is limited to determining" (1) whether a valid arbitration agreement exists and (2) whether it encompasses the dispute at issue. *Chiron Corp. v. Ortho Diagnostics Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Where "the response is affirmative on both counts, then the Act **requires** the court to enforce the arbitration agreement in accordance with its terms." *Id.* (emphasis added).

**i. <u>The Arbitration Agreement Is a Valid Contract.</u>**

California law confirms the Arbitration Agreement is enforceable. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation"). Under California law, contract formation requires (1) mutual assent and (2) consideration. *Mahram v. The Kroger Co.*, 324 Cal. Rptr. 3d 575, 579 (Cal. Ct. App. 2024). Both requirements are present here.

### a. Plaintiff Understood His Internet Services Were Governed by Terms and Conditions.

There is no serious dispute that Plaintiff was aware his internet services would be governed by terms and conditions, as he confirmed as much at his deposition, explaining: "we all know we face terms and conditions when signing up for stuff[.]" (Sosnicki Decl. ¶ 4, Exh. 1, 132:13-14.)

When presented with the checkout page exemplar, and asked if he remembered reviewing the language confirming his assent to the terms of service, Plaintiff asserted: "It's not memorable, no, but I could believe that it was there when I checked out." (*Id.*, 126:25-127:1.) He then confirmed "[i]t's not uncommon maybe for there to be a tick box about terms of service. Seems reasonable," and that he expected terms and conditions to apply where a monthly service agreement was involved:

> Q But what types of products have you bought that have had similar tick boxes as in what's been Bates labeled Charter 978?[3]
>
> A Probably stuff that's more in the SAS world, right. I don't know. Like your Netflix subscription or stuff like that as opposed to buying a piece of clothing, you know.
>
> . . .
>
> [Q] Do you understand that there are terms of service that apply to your Netflix account?
>
> A I assume there are.
>
> Q And why do you assume there are?
>
> A For all the reasons I think we just discussed. ***I think that it seems common that there are some set of terms or conditions of the service that is being provided that get presented or shared with the customer when buying such monthly services.*** (emphasis added)
>
> . . .
>
> [Q] You testified that you think it's reasonable to expect such terms to exist relating to monthly subscriptions; correct?
>
> A Correct.

[3] CHARTER000978 is an exemplar of the buyflow checkout page and is attached as Exhibit B to the concurrently filed Declaration of David Dean.

(Sosnicki Decl. ¶ 4, Exh. 1, 127:8-131:12.)

Plaintiff's testimony only confirms a common-sense reality that courts have routinely recognized: where a transaction requires a full registration process and contemplates a continuing relationship, users should be on notice to look for a link to the governing terms. *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023). In *Oberstein*, a putative class sued an online ticket retailer under the Sherman Act, and the defendant moved to compel arbitration under its website's terms of service. *Id.* at 509. In holding that the defendant's presentation of those terms put purchasers on notice, the Ninth Circuit noted that "the context of this transaction, requiring a full registration process, reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." *Id.* at 517. Courts thus distinguish between one-off transactions and ongoing relationships: "[c]ourts also consider the transactional context: i.e., whether consumers believe they are engaging in a one-off transaction, such a [sic] purchasing an article of clothing, or entering continuing relationship [sic] that would naturally require terms and conditions." *Cavanaugh v. Fanatics, LLC*, 738 F. Supp. 3d 1285, 1295 (E.D. Cal. 2024).

In *Cavanaugh*, the putative class alleged the defendant used "deceptive and untruthful promises to provide 'free' or flat, low-cost shipping on orders of sports merchandise ordered through its website" but "surreptitiously adds a so-called 'Handling Fee' of $1.99 to all orders." *Id.* at 1290. The defendant filed a motion to compel arbitration, relying on the confirmation page of its registration process, where the users clicked a "Create An Account" button above a "By signing up, you agree to our Terms of Use & Privacy Policy" disclaimer, and on the checkout page of its buyflow, where users clicked a "Place Order" button immediately above a "By placing an order, you agree to our Terms of Use & Privacy Policy" disclaimer. *Id.* at 1292. The court ruled that the account creation screen's non-contrasting and merely underscored hyperlinks were not presented in a sufficiently conspicuous way. *Id.* at

1296. It then noted that "the Fanatics checkout screen is not unduly cluttered and that the hyperlink to the Terms of Use is reasonably conspicuous." *Id.* at 1298. In concluding that the "Terms of Use" hyperlink on the checkout screen was sufficiently conspicuous to show inquiry notice, the court noted that "Ninth Circuit cases decided after *Sellers* grouped context together with evaluation of the visual aspects of the notice, such as font size, text placement, and overall screen design, and analyzed the 'full context of the parties['] transaction.'" *Id*. It ruled that despite "disputes over the exact screens Cavanaugh viewed when signing up for an account, it is undisputed that Cavanaugh went through a registration process to create an account with Fanatics. It is also undisputed that that Cavanaugh participated in Fanatics' FanCash Loyalty Program, which gives users three percent credit on eligible purchases. This indicates a continuing relationship. Therefore, the context of Cavanaugh's purchases weighs in favor of finding sufficient notice" (internal citations omitted). *Id.* at 1299. "Considering all the above," the court enforced the parties' arbitration agreement. *Id.* at 1300. Plaintiff and Charter are in an ongoing, monthly service relationship. Visual analysis of the notice is to be weighed against that backdrop favoring a finding of notice.

There is also no serious dispute that Plaintiff could have read the Residential Terms if he chose to do so. While Charter's presentation of the link to the Residential Terms would survive scrutiny even without a continuing monthly relationship, in the context of an internet subscription and recurring monthly services, its presentation easily satisfies *Berman*. As the court explained in *Berman*, "[f]irst, to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," and "[s]econd, while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent." *Berman*, *supra*, 30 F.4th at 856-57. Here, the hyperlink to Charter's Residential Terms was bolded and in bright blue font, distinguishing it from the grey, non-bolded text around it, and it was placed

in the natural flow of the checkout process. (Dean Decl. ¶ 13, Exh. B.) Courts routinely hold that comparable presentations are reasonably conspicuous. *See Ortiz v. Univ. Credit Union*, No. 25-2207, 2025 WL 3765497, at *2 (9th Cir. Dec. 30, 2025) (reversing the denial of a motion to compel arbitration where "[t]his sentence hyperlinked the arbitration terms, using blue, underscored text, 'distinguished from the surrounding [black and gray] text,' on an uncluttered screen," and noting that "[t]he use of blue, underscored text is akin to the '[c]ustomary' design of blue, capitalized text"). In *Cavanaugh*, the court held that a "Terms of Use" hyperlink at checkout provided reasonably conspicuous notice even though it was "in slightly smaller font than some other elements on the page," because "it is accented in blue which contrasts with the white background of the page" and "is presented immediately below the checkout button, not in an entirely separate section of the screen." *Cavanaugh*, *supra*, 738 F. Supp. 3d at 1297. Charter's hyperlink is stronger still: it is not smaller than the surrounding text, and it appears in bolded, bright blue font. (Dean Decl. ¶ 13, Exh. B.)

Similarly, in *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024), the Ninth Circuit held that where "[t]he notice is on an uncluttered page and is not hidden or obscured," "is clear and legible, and the hyperlinked phrase 'terms of use' is colored bright green—contrasted against the surrounding white background and adjacent black text," the purchaser was provided notice of the terms. The Ninth Circuit also noted, like here, that "the 'terms of use' hyperlink is the same color as other clickable links on the page, suggesting clearly that it is a hyperlink." *Patrick*, 93 F.4th at 477. Charter presented Plaintiff the bright blue, bolded hyperlink to the Residential Terms within a clear, bullet-pointed list under a header "Terms of service"—which itself is presented in bold, large font. (Dean Decl. ¶ 13, Exh. B.) The hyperlink contrasts against the white background of the page and the surrounding grey text. The hyperlink stands out from the page and from the remainder of the non-clickable text around it. Charter displayed Plaintiff the Residential Terms in "a font

size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it" by way of a "readily apparent hyperlink." *Berman*, *supra*, 30 F.4th at 856-57. Charter's presentation satisfies the first step of the inquiry-notice internet contract formation test.

**b. <u>Plaintiff Unambiguously Manifested His Assent to the Residential Terms in Multiple Ways.</u>**

"The second step of the inquiry-notice internet contract formation test asks us to consider whether any action taken by the internet user—such as clicking a button or checking a box—'unambiguously manifest[ed] his or her assent' to proposed contractual terms." *Godun v. JustAnswer LLC*, 135 F.4th 699, 710, 712 (9th Cir. 2025).

To place his order, Plaintiff was required to affirmatively check a box confirming his agreement to "Charter's Residential Terms of Service." (Dean Decl. ¶ 13, Exh. B.) The order page advised Plaintiff that: "by checking this box and clicking Submit Order button below, I am representing that: . . . I agree to Charter's Residential Terms of Service." (*Id.*) Plaintiff unambiguously assented to the Residential Terms by checking the required box. *See Patrick*, *supra*, 93 F.4th at 477 ("Here, Running Warehouse indicates clearly that, by submitting an order, the consumer 'confirms [he is] 18 years of age or older and agree[s] to our privacy policy and terms of use.' Plaintiffs do not meaningfully challenge assent on appeal.").

After he signed up, Charter also provided Plaintiff personal notices in monthly billing statements which referenced the Residential Terms—and provided directions to access those terms online. (Dean Decl. ¶ 15, Exh. D); *Hart*, 814 F.App'x at 213–14 ("Because there is no dispute Hart received the relevant billing statements, Hart's continued acceptance of TWC's services constituted assent to the agreement."). And the Residential Terms were, and are, available at all times on Charter's website. (Dean Decl. ¶ 8.)

Charter also instructed Plaintiff that electronic signatures or activating, using,

or paying for "the Service, Equipment or Device" would be construed as acceptance of the Residential Terms. (*Id.* ¶ 8, Exh. A, Residential Terms § 1.a.) As noted above, Plaintiff accepted the Residential Terms through online acknowledgments and activating, using, and paying for Charter's internet services. (*Id.*) Any one of these acts, standing alone, constituted Plaintiff's assent to the Residential Terms and its Arbitration Agreement.

Courts around the country have repeatedly enforced the very same Arbitration Agreement at issue here based on the acceptance methods invited by Charter. *Byrne v. Charter Commc'ns, Inc.*, 581 F. Supp. 3d 409, 413, 417 (D. Conn. 2022) (granting Charter's motion to compel arbitration of claims and finding plaintiff agreed to Residential Terms through continued use and payment following notice of terms); *Cova v. Charter Commc'ns, Inc.*, No. 4:16-cv-469-RLW, 2017 WL 666097, at *4-5 (E.D. Mo. Feb. 17, 2017) (holding Arbitration Agreement accepted through customers' continued use of Charter services after receipt of notice of terms in billing statements); *Hart*, 814 F. App'x at 213-14 (affirming order compelling arbitration based on agreement with Charter predecessor entity and explaining that because the plaintiff "received the relevant billing statements, [the plaintiff's] continued acceptance of [Charter's] services constituted assent to the agreement"). The Central District of California has previously compelled similar claims against Charter to arbitration, finding that subscribers were "provided notice at a minimum through monthly billing statements, Spectrum Statement Notifications, phone representatives, and [Charter's] website." *Moran v. Charter Commc'ns, Inc.*, No. SACV2000303JVSJDEX, 2020 WL 5833640, at *4 (C.D. Cal. June 11, 2020). These cases confirm that Plaintiff assented to the Residential Terms and its Arbitration Agreement.

**c. <u>The Arbitration Agreement Is Supported by Consideration.</u>**

Consideration sufficient to support a contract is broadly defined as "[a]ny

benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled." Cal. Civ. Code § 1605. "A written instrument is presumptive evidence of a consideration." Cal. Civ. Code § 1614. Courts have consistently found that, under California law, a "promise to be bound by the arbitration process itself serves as adequate consideration." *See, e.g.*, *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002); *McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036-JD, 2018 WL 1913832, at *3 (N.D. Cal. Jan. 24, 2018); *Lagatree v. Luce, Forward, Hamilton & Scripps*, 88 Cal. Rptr. 2d 664, 680 (Cal. Ct. App. 1999).

The Arbitration Agreement is presumptively supported by consideration because it is a written contract. Cal. Civ. Code § 1614. Further, the Arbitration Agreement is mutual: it provides that "**Spectrum and Subscriber** agree to arbitrate disputes arising out of or relating to" the Residential Terms. (Dean Decl. ¶ 14, Exh. C, Residential Terms § 30) (emphasis added). Although no further consideration is necessary, Charter also conferred tangible benefits upon Plaintiff by (i) providing internet services and (ii) agreeing to pay filing and arbitrator fees. (*Id.*)

**ii. <u>The Arbitration Agreement Covers Plaintiff's Claims.</u>**

If the Court entertains any disputes regarding the second gateway issue, whether the Arbitration Agreement covers the claims, it should find the broad terms of the Arbitration Agreement encompass Plaintiff's claims. Under both federal and California law "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 938 (9th Cir. 2013) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)); *Ruiz v. Sysco Food Servs.*, 18 Cal. Rptr. 3d 700, 712–13 (Cal. Ct. App. 2004). "The Ninth Circuit has held that where an arbitration clause includes language such as 'arising out of or relating to' the relationship between the parties, the clause should be interpreted broadly." *Sapan v. Directv, LLC*, No. 822CV01600FWSJDE, 2023 WL 5505914, at *6 (C.D. Cal. June 9, 2023) (citing *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999)). Such broad provisions

implicate "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Id.*

The Arbitration Agreement employs this expansive language. It provides that the parties "agree to arbitrate disputes and claims **arising out of or relating to**" the Residential Terms—which includes billing practices and Charter's "marketing" of internet services. (Dean Decl. ¶ 14, Exh. C, Residential Terms §§ 2, 30) (emphasis added). Plaintiff's claims fall within this broad provision by explicitly contesting the adequacy of Charter's "labeling," "marketing materials," "charges," and by requesting relief affecting related practices. (*See, e.g.*, Compl. ¶¶ 8, 26, 30, 32.) Plaintiff's claims are necessarily derivative of the services provided by Charter, and resolution of Plaintiff's claims will require interpretation of the Residential Terms.

The labeling and billing claims raised in Plaintiff's Complaint arise out of or relate to Charter's Residential Terms, and thus must be arbitrated.

**iii. Plaintiff's Anticipated *McGill* Argument Is Moot and Arbitrability of Claims Should Be Decided by the Arbitrator.**

In opposing Charter's prior Motion to Compel Arbitration, Plaintiff argued that the parties' arbitration agreement is unenforceable because Plaintiff's Complaint seeks "forward-looking injunctive relief to stop Spectrum's ongoing advertising and pricing practices" related to the California Cost Recovery Charge and an order "enjoining Spectrum from advertising its goods and services using pricing that is not inclusive of all fees [and] costs." (Dkt. 15 at 16:1-2, 16:9-10); *see McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 951 (2017).

As Charter has previously explained, that argument is now moot. Plaintiff's *McGill* challenge to the arbitration agreement was based on the arbitration agreement allegedly barring him from obtaining prospective public injunctive relief—specifically, an injunction prohibiting Charter from continuing to charge the California Cost Recovery Charge. But Charter discontinued that fee in June 2026. (Dkt. 29-1, Declaration of Chris Plumitallo ¶¶ 5-6.) The fee no longer appears on

California residential internet subscribers' bills. (*Id.* ¶ 5.) Because there is no ongoing practice for the Court to enjoin, Plaintiff's request for public injunctive relief is moot.

Article III requires a live controversy at every stage of the case, and a claim for prospective injunctive relief becomes moot when subsequent events make it impossible for the court to grant effective relief. *C.F. v. Capistrano Unified Sch. Dist.*, 647 F.Supp.2d 1187, 1195 (C.D. Cal. 2009) ("A federal court's Article III power to hear disputes extends only to live cases or controversies. A request for injunctive relief remains live only so long as there is some present harm left to enjoin," citing *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995)). That principle applies with particular force to requests for injunctive relief, which require a real and immediate threat of future injury, not a dispute over alleged past conduct; where a plaintiff cannot show a reasonable likelihood of being subjected again to the conduct underlying his request for public injunctive relief, that request—and any argument based on it—is moot. *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) ("A request for injunctive relief remains live only so long as there is some present harm left to enjoin . . . A plaintiff who cannot reasonably be expected to benefit from prospective relief ordered against the defendant has no claim for an injunction."). Plaintiff's requested injunction is prospective, as it seeks to stop Charter's future conduct in advertising and pricing practices and to prevent the California Cost Recovery Charge from being billed to California internet subscribers. Now that Charter has retired the challenged fee, there is no continuing conduct for an injunction to restrain, and no prospective injury for an injunction to prevent. *Id.* at 864 ("a claim for injunctive relief becomes moot once subsequent events have made clear the conduct alleged as the basis for the requested relief 'could not reasonably be expected to recur.'").

The California Cost Recovery Charge, as was always intended, was discontinued in June 2026. It was a charge imposed for a limited duration for a limited purpose. There is no future harm for Plaintiff to seek to enjoin.

Notwithstanding the lack of imminent harm, Plaintiff and Charter expressly delegated the determination of what claims are arbitrable or not arbitrable—including matters of unconscionability or public policy—to an AAA arbitrator. (Dean Decl. ¶ 14, Exh. C, § 30.) Plaintiff's anticipated contention that the Residential Terms' arbitration provision improperly waives his right to seek injunctive relief is therefore an issue that must be determined by the arbitrator—not this Court. *Caremark*, 43 F.4th at 1030; *Crypto Asset Fund, LLC v. OPSkins Grp. Inc.*, 478 F. Supp. 3d 919, 929 (C.D. Cal. 2020) (upholding a delegation clause despite argument "the arbitration agreement wa[s] unenforceable on grounds of fraud, unconscionability, and public policy").

Indeed, "courts routinely hold that the resolution of a *McGill* rule challenge is a gateway issue subject to delegation under a clause like the one here." *B.D. v. Blizzard Ent., Inc.*, 76 Cal.App.5th 931, 959 (2022); *Marselian v. Wells Fargo & Co.*, 514 F.Supp.3d 1166, 1176 (N.D. Cal. 2021) ("[T]he application of the '*McGill* rule' is a gateway issue that may be delegated to the arbitrator."); *Wilson v. Wells Fargo & Co.*, No. 20-cv-2307-DMS-WVG, 2021 WL 1853587, at *4 (S.D. Cal. May 10, 2021) (holding, similar to the facts in this case, that "where . . . the parties have delegated arbitrability to the arbitrator, the application of *McGill* is a question for the arbitrator, not the Court, to decide."); *Ramirez v. Elec. Arts Inc.*, No. 20-cv-05672 BLF, 2021 WL 843184, at *4 (N.D. Cal. Mar. 5, 2021) ("The issue presented here— whether the Arbitration Provision is unenforceable because it improperly limits the right to seek public injunctive relief—is clearly a matter regarding the validity of the Arbitration Provision. As such the Court finds that it is plainly delegated to an arbitrator, rather than this Court, to decide."). Here, the Residential Terms' arbitration provision plainly provides that "[t]he arbitrator shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, scope, or enforceability of these arbitration provisions and these Terms of Service." (Dean Decl. ¶ 14, Exh. C, § 30.)

While the Court may decide issues of contractual formation (i.e., whether an

agreement to arbitrate claims exists), the determination of what claims are arbitrable and the scope and enforceability of the agreement must be decided by the arbitrator. (*Id.*) As agreed by and between the parties, this Court should therefore leave the *McGill* issue to the arbitrator.

## IV. **PLAINTIFF'S CLASS ALLEGATIONS SHOULD BE STRICKEN BASED ON HIS WAIVER OF CLASS CLAIMS**

"Pursuant to Rule 23(d)(1)(D), the court may strike class allegations if the complaint plainly reflects that a class action cannot be maintained." *Melili*, 2023 WL 12173445, at *3 (quotation marks omitted). Because Plaintiff has expressly waived any right to participate in class claims, his attempt to represent a class is unsustainable, and all class allegations should be stricken.

In relevant part, the Residential Terms provide as follows:

- "SUBSCRIBER AND SPECTRUM AGREE THAT CLAIMS MAY ONLY BE BROUGHT IN A PARTY'S INDIVIDUAL CAPACITY AND NOT ON BEHALF OF, OR AS PART OF, A CLASS ACTION OR REPRESENTATIVE PROCEEDING." (Dean Decl. ¶ 14, Exh. C, Residential Terms § 30) (emphasis in original).
- "[U]nless both Subscriber and Spectrum agree otherwise in writing, the arbitrator may not consolidate proceedings or more than one person's claims and may not otherwise preside over any form of representative or class proceeding." *Id.*
- "BOTH PARTIES AGREE TO WAIVE, TO THE FULLEST [EXTENT] PERMITTED UNDER APPLICABLE LAW . . . ANY RIGHT TO PARTICIPATE IN CLASS ACTIONS." *Id.* (emphasis in original).

Class action waivers in consumer contracts, such as this, are valid and must be enforced according to their terms. *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 346, 352 (2011); *Melili*, 2023 WL 12173445, at *3 (granting motion to strike class claims based on waivers in Charter's Residential Terms).

Accordingly, the Court should strike Plaintiff's class allegations.

## V. <u>THIS ACTION SHOULD BE DISMISSED OR AT LEAST STAYED</u>

The Court should dismiss this case after ordering it to arbitration. *See Brennan*, 796 F.3d at 1134 (affirming a "district court's order dismissing [an] action in favor of arbitration"). Further, there is no purpose in staying the matter given that Plaintiff cannot maintain a class action. *See Ligorria v. Loomis Armored US LLC*, No. CV 22-7116 PA (MARx), 2023 WL 3272397, at *3 (C.D. Cal. Feb. 28, 2023) (compelling arbitration and dismissing the action based on the plaintiff's class waiver).

At a minimum, the Court should stay any portion of Plaintiff's case that survives this motion. When a "suit or proceeding is referrable to arbitration" under the FAA, courts must "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. This statutory mandate does not leave the Court any discretion.

## VI. <u>CONCLUSION</u>

For the reasons stated, Charter respectfully requests the Court compel Plaintiff's claims to arbitration, strike Plaintiff's class allegations in the Class Action Complaint, and dismiss or stay the action.

DATED: November 5, 2026 **THOMPSON COBURN LLP**

By: ______________________________

**LUKAS SOSNICKI**
**JOSEPH SCOTT**
**GREGORY G. BREZOVEC**
Attorneys for Defendant
CHARTER COMMUNICATIONS, INC.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Charter Communications, Inc., certifies that this brief contains 6,945 words, which complies with the word limit set by L.R. 11-6.1 and Judge Olguin's Initial Standing Order, dated July 2025.

DATED: November 5, 2026

**THOMPSON COBURN LLP**

By: ______________________

**LUKAS SOSNICKI**
**JOSEPH SCOTT**
**GREGORY G. BREZOVEC**
Attorneys for Defendant
CHARTER COMMUNICATIONS, INC.